**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| MALLORY WOODFORK, *individually and as Administratrix of the Estate of* CALVIN CAINS, III, *deceased.* | |
| Plaintiff, | |
| v. | **COMPLAINT** |
| JOSEPH P. LOPINTO, III, *in his official capacity as the Sheriff of Jefferson Parish, Deputy* CLINSTON GADEA, *in his individual and official capacity*, Deputy RICKY FUENTES, *in his individual and official capacity*, Deputy RYAN RIVETTE, *in his individual and official capacity,* Deputy DONALD CLOGHER, *in his individual and official capacity,* Deputy JOHN DOE #1, *in his individual and official capacity,* Deputy JOHN DOE #2, *in his individual and official capacity,* Deputy JOHN DOE #3, *in his individual and official capacity*, and Officer JOHN DOES #4-10, *in their individual and official capacities*. | **(Jury Trial Demanded)** |
| Defendants. | |

NOW COMES Plaintiff, Mallory Woodfork, individually and as Administratrix of the Estate of Calvin Cains, III, deceased ("Plaintiff," Decedent, or "Mr. Cains"), by and through undersigned counsel, and brings this Complaint against Defendant Joseph P. Lopinto, Sheriff of the Jefferson Parish Sheriff's Office; and Defendant Clinston Gadea, Defendant Ricky Fuentes, Defendant Ryan Rivette, and Defendant Donald Clogher (the Arresting Defendants); and Defendant John Doe #1, Defendant John Doe #2, Defendant John Doe #3 and Defendant John Doe #4 (the John Doe Defendants) who at all times relevant hereto were/are deputies employed by the Jefferson Parish Sheriff's Office and/or Officers at the New Orleans Police Department.

1

# I. NATURE OF THE CASE

1.      This action arises out of the violent death of Calvin Cains, III, at the hands of Jefferson Parish Deputies and/or unknown officers from the New Orleans Police Department, and the unconstitutional practices of the Jefferson Parish Sheriff's Office, as overseen by Sheriff Lopinto, which together manifested the unreasonable and unconstitutional use of force which took Decedent's life.

2.      On June 6, 2023, in the City Metairie, Louisiana, Defendant Deputies from Defendant Jefferson Parish Sheriff's Office (JSPO), including Defendants Clinston Gadea, Ricky Fuentes, Ryan Rivette, Sergeant Donald Clogher (the Arresting Defendants) and John Doe #1, John Doe #2, John Doe #3, and John Doe #4 (the John Doe Defendants) effected an unreasonable seizure of Mr. Cains, an unarmed Black male, when they shot him moments after he entered a car and sat in the driver's seat, while not moving the vehicle towards any Defendant nor otherwise posing any threat of death or serious bodily harm to the Defendant Deputies or others.

3.      Defendant Sheriff Joseph Lopinto, as the top law enforcement officer and policymaker at the Jefferson Parish Sheriff's Office (JPSO), promulgated, established, acquiesced in, and/or implemented an official policy or custom that was a cause in fact of the deprivation of rights inflicted upon Decedent Calvin Cains, to wit: Sheriff Lopinto sanctioned, condoned, and/or ratified, a policy of effecting violent arrests, shootings, and other lethal force which disproportionately targeted African Americans and which in fact resulted in the use of excessive force which violated Decedent's rights under the Fourth Amendment to the United States Constitution and caused his death.

## II.  JURISDICTION AND VENUE

4.     Plaintiff's case arises under the Constitution and laws of the United States, specifically, the Fourth and Fourteenth Amendments to the United States Constitution.

5.     Plaintiff's suit is authorized by 42 U.S.C. § 1983 (allowing suit to address constitutional violations) and 42 U.S.C. § 1988 (providing for an attorney's fee and litigation expense awards).

6.     This Court has jurisdiction over Plaintiff's federal constitutional claims under 28 U.S.C. §§ 1331 and 1343.

7.     This case also arises under the common and statutory law of the State of Louisiana.

8.     This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

9.     One or more of the Defendants reside in Metairie, Louisiana and/or Jefferson Parish, Louisiana, and all the acts alleged herein occurred within Jefferson Parish, Louisiana; therefore, under 28 U.S.C. § 1391, venue is proper in the United States District Court for the Eastern District of Louisiana.

## III. PARTIES

**A.     Plaintiff**

10.     At all times relevant to this action, Calvin Cains, III was a resident of the City of Metairie, Jefferson Parish, Louisiana. While living in Metairie, Louisiana, Mr. Cains died as a result of Defendants' use of excessive force against him and/or their policy of excessive force which Defendant Sheriff Lopinto promulgated, ratified, and/or implemented and which in fact resulted in

the use of excessive force which violated Decedent's rights under the Fourth Amendment to the United States Constitution and caused his death.

11.     Mallory Woodfork ("Plaintiff") is the mother of Calvin Cains, III, and she was appointed as the Administratrix of the succession of Calvin Cains, III on October 5, 2023. At all times relevant to this action, Ms. Woodfork is a resident of New Orleans, Louisiana, in the City of Metairie.

**B.     Defendants**

12.     Defendant Sheriff Joseph Lopinto (Defendant Lopinto) is the top law enforcement officer and chief policymaker at the JPSO.

13.     Defendant Lopinto is responsible for policymaking and ratification of official Sheriff's Office policies. He is also responsible for the appointment, training, supervision, promotion, and discipline of all deputies and supervisory deputies at the JPSO, including the Defendants named herein.

14.     Defendant Clinston Gadea (Defendant Gadea) is a sheriff's deputy employed by JPSO. Upon information and belief, Defendant Gadea is domiciled in the Eastern District of Louisiana, and is subject to the personal jurisdiction of this Court.

15.     Defendant Gadea was on duty as a law enforcement officer/sheriff deputy during the arrest and death of Decedent.

16.     He acted under the color of law when he used excessive force and deprived Decedent of his Fourth Amendment Right under the United States Constitution to be free from unreasonable searches and seizures.

17.     Defendant Ricky Fuentes (Defendant Fuentes) is a sheriff's deputy employed by JPSO.

18.     Upon information and belief, Defendant Fuentes is domiciled in the Eastern District of Louisiana and is subject to the personal jurisdiction of this Court.

19.     Defendant Fuentes was on duty as a law enforcement officer/sheriff deputy during the arrest and death of Decedent.

20.     He acted under the color of law when he used excessive force and deprived Decedent of his Fourth Amendment Right under the United States Constitution to be free from unreasonable searches and seizures.

21.     Defendant Ryan Rivette (Defendant Rivette) is a sheriff's deputy employed by JPSO. Upon information and belief,

22.     Defendant Rivette is domiciled in the Eastern District of Louisiana and is subject to the personal jurisdiction of this Court.

23.     Defendant Rivette was on duty as a law enforcement officer/sheriff deputy during the arrest and death of Decedent.

24.     Defendant Sergeant Donald Clogher (Defendant Clogher) is a sheriff's deputy employed by JPSO.

25.     Upon information and belief, Defendant Clogher is domiciled in the Eastern District of Louisiana and is subject to the personal jurisdiction of this Court.

26.     Defendant Clogher was on duty as a law enforcement officer/sheriff deputy during the arrest and death of Decedent.

27.     Defendant John Doe #1, John Doe #2, and John Doe #3  (John Doe Defendants)  are sheriff's deputies and/or law enforcement officers and/or supervisors and/or detectives employed by JPSO and/or the New Orleans Police Department whose identities are unknown at the present time but upon information and belief, are domiciled in New Orleans, Louisiana, and are subject to the

personal jurisdiction of this Court. The John Doe Defendants were on duty as law enforcement officers and/or sheriff's deputies at the JPSO and/or New Orleans Police Department during the arrest and death of Decedent, as follows.

> a. Defendant John Doe #1: A white male deputy, approximately 5'8" from the JPSO with a light red/pink shirt, initially approached Plaintiff and instructed her to get out of her car and that they were there for Calvin.
>
> b. Defendant John Doe #2: Immediately after the shooting, a tall black deputy from the JPSO detained Plaintiff and her young son Aliija in the rear of a police car. After the shots were fired, he asked Plaintiff to call Decedent and tell him to get out of the car.
>
> c. John Doe #3: a white male, possibly had a beard, approximately 5'9", heavy set, and chewing tobacco. After the shooting and death of Decedent, this deputy informed Plaintiff that deputies had searched her house and found her weapon/handgun and would be taking it to the Sheriff's office for ballistics testing.
>
> d. John Does # 4-10: As yet unknown officers who fired gunshots at Decedent, searched the home, and/or participated in the detention of Plaintiff.

28.    All Defendants acted under color of law when they used excessive force and/or facilitated the use of excessive force and deprived Decedent of his Fourth Amendment Right under the United States Constitution to be free from unreasonable searches and seizures.

29.    All Defendants are being sued in their official and/or individual capacities as sheriff's deputies at the JPSO for their unconstitutional actions and/or failures to act.

## IV.  **STATEMENT OF FACTS**

30.     On June 6, 2023, the Arresting Defendants drive to the residence of Decedent, an apartment complex located at 3301 W. Esplanade Ave, Metairie, LA.

31.     The Arresting Defendants park their marked and/or unmarked law enforcement issued vehicles near Decedent's mother's residence to execute an arrest warrant.

32.     Decedent, a 2023 graduate of Booker T. Washington High School in New Orleans, lives on his own with a girlfriend, but often stops by to see his mother, Mallory Woodfork, to do laundry or visit with her.

33.     Early that morning, when Plaintiff leaves for work, she leaves a specific door of her apartment unlocked because Decedent said he is going to stop over.

34.     Just after 3 p.m. on June 6, 2023, as Plaintiff is on her way home with her six-year-old son, Calvin's little brother, she pulls into the driveway of the Lumiere Apartments on West Esplanade Avenue, where she resides in Building 20.

35.     Plaintiff expects to arrive home and see Decedent, whom she calls "Trey," because Decedent called her on FaceTime while she was at work and asked her to pick up milk, since he had a taste for a bowl of cereal.

36.     When Plaintiff reaches Building 13, by the leasing office, an unmarked small pickup truck pulls out to follow her and a deputy gets out, runs toward her, and asks her to stop.

37.     "Mallory?" he asks, his tone very serious.

38.     "Step out of the car," he says.

39.     Plaintiff follows the deputy's directions.

40.     The deputy scans the car, finding only her six-year-old son, Decedent's little brother.

41.     Plaintiff asks the deputy what she has done.

42.     "You didn't do anything," the deputy says. "We're looking for your son, Calvin. Have you seen him?"

43.     Moments later, Decedent, weighing only about 110 pounds, walks out the front door of Building 20.

44.     None of the Arresting Defendants announce themselves or order Decedent to stop walking, lay down, show his hands, or freeze.

45.     Instead, as Decedent enters and closes the driver's side door of a Toyota parked in front of Building 20, Plaintiff sees an unmarked white Ford F150 drive toward the front of the Toyota at such speed that she thought it was going to crash into Decedent's car head-on.

46.     Simultaneously, another truck, an unmarked Toyota, speeds toward Decedent from his driver's side and stops.

47.     At the same instant, Plaintiff hears gunshots.

48.     Decedent is shot immediately in the head, through the windshield.

49.     Plaintiff rushes to cover her younger son's eyes while feeling terrified as she wonders what happened to Decedent.

50.     But then a female New Orleans Police Department (NOPD) officer comes to her location and tells her that her son is all right, saying, "Trust me, he's not shot."

51.     As Plaintiff looks toward her apartment, she sees green smoke from smoke grenades that have been tossed near the Toyota that her son was driving.

52.     Deputies move toward the Toyota with SWAT-team shields and AR-15 rifles pointing at the Toyota.

53.     A deputy/officer tells Plaintiff to back her car into a parking spot by the leasing office and is ushered into the back of another unmarked car.

54.     One of the Arresting Defendants and/or John Doe Defendants instruct Plaintiff to call her son, as if he was resisting arrest.

55.     Plaintiff calls and calls but gets no answer.

56.     Plaintiff then sits, as ordered to do, in a law enforcement car for the next two hours, terrified about what is happening but wanting to remain calm because of her younger son.

57.     And at one point, Plaintiff hears a loud amplified voice announce: "Jefferson Parish Sheriff's Office: Get out of the car."

58.     Plaintiff hears no more shots, so she assumes the Arresting Officers and/or John Doe Defendants must have taken her son into custody.

59.     Then, just before 5 p.m., a male detective from the New Orleans Police Department comes to speak with Plaintiff.

60.     "What's going on with my baby?" Plaintiff asks.

61.     "Calvin is fine. Let's go into the leasing office. I know you're sick of sitting in the car," the detective says. There, someone offers them water.

62.     Then the same officer looks her in the eyes and tells Plaintiff, "I don't know how else to say it. He didn't make it."

63.     Days later, Decedent's autopsy classifies his death as a homicide.

64.     In media coverage of Decedent's shooting, Captain Jason Rivarde from the JPSO tells the media, "There's one group that is investigating, that's us."

65.     Defendant Sheriff Lopinto tells the media that two of the deputies who were involved in shooting Decedent were wearing body cameras, and that this footage will be reviewed.

66.     In a statement, the ACLU of Louisiana, who has pushed for a federal investigation into JPSO over racist policing and excessive force, called on the department to "immediately release" the body camera and any dashcam footage of the incident.

67.     Sheriff Lopinto watched the body camera footage of the shooting.

68.     After watching the body camera footage, Lopinto said that Cains' attempt to escape "put one of our deputy's lives in danger."

69.     After watching the body camera footage, Lopinto said that the shooting officer(s) "utilized the proper force."

70.     After watching the body camera footage, Lopinto approved of the arresting and shooting deputies' decisions and the basis for those decisions. On information and belief, JPSO did not conduct any internal affairs investigation into the death of Mr. Cains.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violations of the U.S. Constitution
### (42 U.S.C. § 1983)

71.     All preceding paragraphs are incorporated as if fully set out herein.

72.     This claim  is brought pursuant to Title 42 U.S.C. § 1983.

73.     Title 42 U.S.C. §1983 states, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

74.    The Fourth Amendment to the United States Constitution states, in relevant part, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."

75.    For decades, United States Supreme Court has interpreted the Fourth Amendment to the United States Constitution to prohibit a police officer's use of excessive force during the arrest of an unarmed citizen. *See, e.g., Tennessee v. Garner*, 471 U.S. 1, 2 (1985). ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

76.    The U.S. Court of Appeals for the Fifth Circuit has detailed the elements of a Use of Force Claim in this District, to wit: "To prevail on such a claim, a plaintiff must show "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Orr v. Copeland*, 844 F.3d 484, 492 (5th Cir. 2016).

77.    While acting under color of state law, the Defendants deprived Plaintiff of his well-established right to be free from excessive force, per the authority cited herein.

78.    At all times relevant to this action, Plaintiff asserts Decedent had the clearly established constitutional right not to be subjected to excessive force while being arrested, even if his arrest could have been otherwise proper.

79.    In other words, on June 6, 2023, the Defendants were only permitted to use the amount of force necessary under the circumstances to arrest Decedent.

80.    The Arresting Defendants and/or Defendant Gadea and/or the John Doe Defendants violated Decedent's clearly established right to be free from excessive force under the Fourth Amendment to the United States Constitution when they and/or he chose to shoot Decedent when

Decedent was merely sitting in a car, made no threats nor violent gestures toward any person, neither brandished nor possessed any weapons, and when no Defendant announced his/her presence nor faced any violent resistance – effectively ambushing Decedent in a hail of bullets.

81.     While acting under color of state law, the Arresting Defendants and/or Defendant Gadea and/or the John Doe Defendants deprived Decedent of his clearly established right to be free from excessive force by shooting him under circumstances in which it was objectively clear that Decedent was merely sitting in a parked car, making no threats nor violent gestures of any kind towards any person, nor posing any threat to any person and he was just sitting in the driver's side of a stationary Toyota automobile.

82.     Defendant Fuentes used excessive force, in violation of the Fourth Amendment, when he shot and/or otherwise assisted or encouraged the shooting of Decedent while Decedent was unarmed, made no threats nor violent gestures toward any person, and was just sitting in the driver's side of a stationary Toyota automobile.

83.     Defendant Rivette used excessive force, in violation of the Fourth Amendment, when he shot and/or otherwise assisted or encouraged the shooting of Decedent while Decedent was unarmed, made no threats nor violent gestures toward any person, and was just sitting in the driver's side of a stationary Toyota automobile.

84.     Clogher used excessive force, in violation of the Fourth Amendment, when he shot and/or otherwise assisted or encouraged and/or approved of the shooting of Decedent while Decedent was unarmed, made no threats nor violent gestures toward any person, and was just sitting in the driver's side of a stationary Toyota automobile.

85.     The John Doe Defendants used excessive force, in violation of the Fourth Amendment, when he/she/they shot and/or otherwise assisted or encouraged the shooting of

12

Decedent while Decedent was unarmed, made no threats nor violent gestures toward any person, and was just sitting in the driver's side of a stationary Toyota automobile.

86.      As a consequence of the Arresting Defendants and/or the John Doe Defendants actions or failures to act as aforesaid, Decedent suffered a violation of his right to be free from excessive force under the Fourth Amendment and was shot to death, and Plaintiff was damaged as detailed in the Damages section of this Complaint.

87.      Defendants also violated Plaintiff's constitutional rights when they searched her home without probable cause, or after probable cause had dissipated due to the death of Decedent, and when they unlawfully detained her in a vehicle.

**SECOND CLAIM FOR RELIEF**
**Failure to Intervene in Violation of the Fourth Amendment**
**(42 U.S.C. § 1983)**

88.      All preceding paragraphs are incorporated as if fully re-written herein.

89.      Plaintiff asserts a claim pursuant to 42 U.S.C. § 1983 for violation of the right to be free from excessive force under the Fourth Amendment to the U.S. Constitution, which applies to the actions of local governments pursuant to the Fourteenth Amendment.

90.      "An officer is liable for failure to intervene when that officer: (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act." *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 343 (5th Cir. 2020).

91.      Bystander liability requires more than mere presence in the vicinity of the violation; "we also consider whether an officer 'acquiesced in' the alleged constitutional violation. *Id.*

92.     The Arresting Defendants and the John Doe Defendants were present at the scene of the constitutional violation that ocurred in this case, to wit: they were outside the apartment that Decedent exited as he walked towards a Toyota automobile.

93.     When the first gun shot rang out, the Arresting Defendants and the John Doe Defendants knew that a fellow officer/deputy had subjected Decedent to unreasonable and excessive force, to wit: they were present when:

    a.   Decedent had not displayed or brandished any weapon;

    b.   Decedent made no threatening gestures or remarks towards any person;

    c.   Decedent did not notice or look at any officer or deputy because each were in their own separate motor vehicles; and

    d.   Decedent was sitting in a stationary automobile when the shooting started.

94.     The Arresting Defendants and the John Doe Defendants had a reasonable opportunity to prevent the shooting of Decedent but chose not to act, to wit:  as Decedent made his way peacefully to the Toyota automobile as aforesaid, the Arresting Defendants and the John Doe Defendants had time but chose not to:

    a.   Announce themselves and order Decedent to the ground as he exited the apartment;

    b.   Approach Decedent from behind as he exited the apartment and bring him safely to the ground; or

    c.   Approach Decedent before he got inside the Toyota automobile, order him to stop walking, and surround him with a number of officers to ensure a safe and reasonable apprehension of Decedent at the scene.

95.     As a consequence of the Arresting Defendants and/or the John Doe Defendants actions or failures to act as aforesaid, Decedent suffered a violation of his right to be free from excessive force under the Fourth Amendment and was shot to death, and Plaintiff was damaged as detailed in the Damages section of this Complaint.

### THIRD CLAIM FOR RELIEF
**Municipal Liability pursuant to *Monell***
**(42 U.S.C. § 1983)**

96.     All preceding paragraphs are incorporated as if fully re-written herein.

97.     This claim is brought pursuant to 42 U.S.C. § 1983.

### Unwritten Policy or Custom

98.     Defendant Lopinto oversees an armed police force, the JPSO, with the power to arrest citizens.

99.     Defendant Lopinto is the Sheriff of the JSPO, making him the top policy-maker and supervisor for the JSPO.

100.    Defendant Lopinto is responsible for adopting, implementing, promulgating, and enforcing the policies, customs, and practices of the JPSO as applicable to the deputies under his command, and his decisions and acts can be fairly attributed to those of the JPSO and/or Jefferson Parish itself.

101.    Defendant Lopinto is ultimately responsible for the assignment of personnel for training purposes as well as having the final say as to what training does or does not occur for deputies at the JPSO.

102.    Defendant Lopinto is aware that his officers engage in violent behavior that involves excessive force in violation of the Fourth Amendment which disproportionately involves African Americans, to wit:

a. Based on data collected from 2013 to 2020, a Black person was 11.3 times as likely to be killed by police than a white person in Jefferson Parish.[1]

b. Though Black people only made up 27% of the Jefferson Parish population, they made up 73% of the people killed by the police.[2]

c. 40 people have been shot by JPSO officers since 2013, of which 73% were Black.[3]

d. From January 2015 to November 2021, at least 12 men and boys died during an arrest or pursuit by JPSO - all were Black or Latino; three were minors.[4]

e. Since 2018, at least five Black people were killed by JPSO.[5]

f. The racial disparity in deadly force by JPSO is worse than 95% of other police departments.[6] These statistics are further buttressed by 30 federal civil rights lawsuits filed against JPSO since 2010—the vast majority of which involve excessive force against people of color.[7]

103.    Defendant Lopinto has perpetuated a racist legacy at the JSPO, to wit:

---

1 *See Jefferson Parish Sheriff's Department*, POLICE SCORECARD (2020), https://policescorecard.org/la/sheriff/jefferson-parish (concluding that a Black person is 11.3 times as likely to be killed by police than a white person in Jefferson Parish).

2 *Overview of Office and Mission Statement*, JEFFERSON PARISH SHERIFF'S OFFICE, https://www.jpso.com/276/Overview-of-Office-and-Mission-Statement (last visited Nov. 3, 2021); Richard A. Webster, *They Saw Me and Thought the Worst*, PROPUBLICA (Sept. 24, 2021), https://www.propublica.org/article/across-the-parish-line.

3 *Id.*

4 *See* Lisa Riordan Seville & Hannah Rappleye, *A Sheriff's Deputy Shot a 14-year-old Boy. It Went Unreported for Months.*, NBC NEWS (July 16, 2020), https://www.nbcnews.com/news/us-news/sheriff-s-deputy-shot-14-year-old-boy-it-went-n1234057.

5 John Simerman et al., *Jefferson Parish Sheriff's Office an Outlier on Body Cams as Criticism Swirls Around Deadly Force*, THE TIMES-PICAYUNE / THE NEW ORLEANS ADVOCATE (June 27, 2020), https://www.nola.com/news/crime_police/article_cb8b82da-b8a1-11ea-bfec-6bf1ae8b2595.html.

6 *See Jefferson Parish Sheriff's Department*, POLICE SCORECARD (2020), https://policescorecard.org/la/sheriff/jefferson-parish.

7 Kathryn Casteel, *Demanding Accountability: SPLC Sues La. Sheriff's Office for Public Records Regarding Officer Brutality*, SOUTHERN POVERTY LAW CENTER (Apr. 16, 2021), https://www.splcenter.org/news/2021/04/16/demanding-accountability-splc-sues-la-sheriffs-office-public-records-regarding-officer.

a. For nearly three decades, former Sheriff Harry Lee wove his overtly anti-Black beliefs into the JPSO. For example, after Hurricane Katrina caused a spike in crime in Jefferson Parish, Lee proudly and publicly announced: "[w]e know where the problem areas are. If we see some black guys on the corner milling around, we would confront them.[8]

b. Driving while Black was also a crime according to Lee, who "vowed to stop and question blacks driving 'rinky-dink cars' in white neighborhoods."[9]

c. In 2006, he plainly admitted: "[w]e're only stopping black people."[10]

d. Over and over, all the while using the royal "We," Lee emphasized: "[w]e know the crime is in the black community. Why should I waste time in the white community?"[11]

e. Lee and his views were unfortunately popular among those Jefferson Parish residents who re-elected him seven times.[12] His longtime reign allowed his views to become firmly entrenched within the fabric of JPSO.[13] It is no secret that Lee hand-picked his successor, Newell Normand, his close aide and protégé, who went on to win 90% of the vote.[14] Normand was re-elected three times before he

---

8  John Burnett, Larger-Than-Life Sheriff Rules Louisiana Parish, NPR (Nov. 28, 2006), https://www.npr.org/templates/story/story.php?storyId=6549329
9 *Id.*
10 Adam Nossiter, *Harry Lee, Outspoken Louisiana Sheriff, Dies at 75*, NEW YORK TIMES (Oct. 2, 2007), https://www.nytimes.com/2007/10/02/us/02lee.html.
11 John Burnett, Larger-Than-Life Sheriff Rules Louisiana Parish, NPR (Nov. 28, 2006), https://www.npr.org/templates/story/story.php?storyId=6549329
12 Adam Nossiter, *Harry Lee, Outspoken Louisiana Sheriff, Dies at 75*, NEW YORK TIMES (Oct. 2, 2007), https://www.nytimes.com/2007/10/02/us/02lee.html.
13 *See id.*; Burnett, *supra.*
14 Michelle Hunter, *Jefferson Parish Sheriff Newell Normand Says He's 'Going Out on Top,'* NOLA.COM (July 26, 2017), https://www.nola.com/news/crime_police/article_d2bc031d-617f-52ea-85fb-df44d0039826.html.

decided to resign,[15]   at which point he endorsed the current Sheriff Joseph Lopinto, III.[16]

   f.   Lopinto proudly follows in the footsteps of his predecessors, both of whom he has identified as "great role models" over his career.[17] Crucially, he "ha[s] never uttered anything less than a compliment about [Lee],"[18] whose racist views continue to drive JPSO's behavior. "'The Black community . . . fear[s] the Jefferson Parish Sheriff's Office,'"[19] and this fear is justified. There is no question that "[JPSO] deputies follow starkly different rules [from other major Louisiana law enforcement organizations]—over … use of force, and the disciplinary process."[20]

   104.   Defendant Lopinto endorses and/or implements and/or acquiesces in a long-standing and unwritten policy or custom of shielding deputies from consequences for their discriminatory application of violence and/or use of excessive force and/or ignoring the use of excessive force on citizens during arrests, to wit:

   a.   Defendant Lopinto accepts excessive force as a condition of police work at the JPSO, to the extent that deputies are trained and aided on how to avoid

---

15 *Id.*
16 Advocate Staff Report, *Learn More About Joe Lopinto -- Newell Normand's Successor as Jefferson Parish Sheriff*, NOLA.COM (July 25, 2017), https://www.nola.com/article_596c4bd3-cb80-5e1f-bbf5-9b62b1ded48f.html.
17 Christopher Tidmore, *From Beating Lee to Becoming Sheriff, Newell Normand Retires*, LOUISIANA WEEKLY (July 31, 2017), http://www.louisianaweekly.com/from-beating-lee-to-becoming-sheriff-newell-normand-retires/.
18 *Id.*
19 *Id.*
20 John Simerman et al., *Jefferson Parish Sheriff's Office an Outlier on Body Cams as Criticism Swirls Around Deadly Force*, THE TIMES-PICAYUNE / THE NEW ORLEANS ADVOCATE (June 27, 2020), https://www.nola.com/news/crime_police/article_cb8b82da-b8a1-11ea-bfec-6bf1ae8b2595.html.

prosecution for their violent actions by re-phrasing and artfully summarizing their violent actions and encounters with citizens in police documentation;

b.  For years, Defendant Lopinto  acquiesced to a culture of violence at the JPSO by abandoning his duty under the *Constitution for the State of Louisiana* to exercise control over the JPSO and by avoiding any study of the number of excessive force cases and violence involved in the arrest of citizens by the JPSO;

c.  For years prior to Decedent's death, Defendant Lopinto  perpetuated a culture of violence in the JPSO by abandoning his duty under the *Constitution for the State of Louisiana* to remove deputies and/or exercise control over the JPSO by allowing deputies to restrict and/or interfere with and/or hamper the internal oversight activities of the JPSO; and/or

d.  For years prior to Decedent's death, Defendant Lopinto  perpetuated a culture of violence at the JPSO by permitting deputies who have engaged in excessive force or unreasonable violence toward citizens to avoid the consequences of discipline or criminal investigation by doing such things as allowing them to simply retire.

105.   The unwritten policy and/or customs stated in the immediately preceding paragraphs is/are known to the Defendant Lopinto who approved, benefitted from, ratified, encouraged, sanctioned, and/or promoted this policy or custom throughout the JPSO.

106.   Following the death of Decedent, Defendant Lopinto continues to approve, ratify, encourage, sanction, and/or promote the policy or custom of ignoring excessive force and fostering a culture of violence as he expresses support for the Arresting Defendants and/or John Doe Defendants actions regarding the death of Decedent, imposed no discipline on those Defendants, and have changed none of the training at JSPO.

107.    To date, Defendant Lopinto has never initiated any meaningful policy reviews or culture reforms regarding excessive force against African Americans within the JPSO.

108.    The aforesaid unwritten policies or customs put Decedent, Plaintiff, and the general public at unreasonable risk of grievous bodily harm, injury, or death.

109.    The aforesaid unwritten policies or customs as shown by the pattern of unreasonably violent cases listed above and reinforced by the lack of meaningful discipline were in fact a cause of the death of Decedent.

110.    At all times relevant hereto, the Defendant Lopinto initiated, authorized, condoned, ratified, and/or encouraged the aforesaid unwritten policies or customs.

111.    Indeed, Defendant Lopinto has gone out of his way to endorse excessive force by his deputies.

112.    For example, in *Lou v. Lopinto,* 21-cv-80 (E.D. La.), which involved the killing of a minor by JPSO deputies, Lopinto represented that he was "fully unified" in the belief that the actions of the deputies "were reasonable and justified."[21]

113.    He has even indemnified deputies for punitive damages in excessive force cases, as in *Lou v. Lopinto,* 21-cv-80 (E.D. La.).

114.    Lopinto watched video of his deputies sit on the back of a restrained, autistic minor until the minor was killed, and Lopinto said that he did not see anything even "problematic."

115.    Even with the benefit of hindsight, after his deputies killed a child, Lopinto said that he did not think it would be "important to reevaluate [JPSO's] restraint procedure."

116.    Defendant Lopinto worked at the JPSO at the time the aforesaid policies or customs were in place.

---

21 *Lou v. Lopinto*, R. Doc. 23 at 8-9.

117.    Defendant Lopinto, Defendant Clogher, and Captain Jason Rivarde from the JPSO reviewed documents, discussed, and/or received details and information at the JPSO about the manner in which the Defendant Shooters shot and killed Decedent while he was running from them unarmed.

118.    Defendant Lopinto, Defendant Clogher, and Captain Jason Rivarde approved of the Defendant Shooters' conduct.

119.    Defendant Lopinto, Defendant Clogher, and Captain Jason Rivarde were thus on actual and/or constructive notice of these policies or customs but did nothing about them.

**Objective Indifference - Failure to Train, Screen, and Discipline**

120.    All preceding paragraphs are incorporated as if fully re-written herein.

121.    Upon information and belief, Defendant Lopinto does not train his deputies on bias-free policing or use of force, to wit:

a.  Defendant Lopinto did not train, promulgate or enforce a use of force policy at the JPSO that trained officers as to the disparate impact that African Americans experience from the use of force at the JPSO;

b.  Defendant Lopinto did not train, promulgate or enforce a use of force policy at the JPSO that trained deputies as to the appropriate level of force to use in a given situation.

c.  Despite Jefferson Parish being a majority white parish, Defendant Lopinto installed no policy nor practice to prevent the disproportionate number of stops, detention, harassment, and uses of force – including shootings – that deputies at the JPSO inflict upon African Americans.

    d.   JPSO does not even provide training on its written policies. Instead, deputies are only required to read and sign a form that acknowledges that they understand the policies.[22]

122.    Upon information and belief, Defendant Lopinto does not train deputies, such as the Arresting Defendants and/or the John Doe Defendants, to deescalate where persons, like Decedent, are being arrested per a warrant and are entering automobiles while deputies and/or officers are present.

123.    Upon information and belief, JPSO does not discipline officers, such as the Arresting Defendants and/or the John Doe Defendants, who shoot and/or kill persons, like Decedent, who sit in automobiles while unarmed.

124.    Indeed, JPSO does not even conduct internal affairs investigations when its officers kill people.

125.    In a five-year period starting in 2017, there were 19 in-custody deaths at JPSO – and JPSO did not conduct internal affairs investigations or critical incident reviews for any of them.

126.    Instead, shootings and in-custody deaths result in a homicide investigation.

127.    But homicide investigations are conducted to determine whether a crime had been committed and not whether a deputy violated policy or the constitution.

128.    JPSO internal homicide investigations are often assigned to Keith Dowling, an officer with a proven track record of dishonesty.

---

22 *See Lou v. Lopinto*, R. Doc. 144-3 - Pizzolato Dep., 30:4-13 (Q. I call that a read and sign. They have to acknowledge that they have gotten it, and they have to comply with it, correct? A. Yes. Q. And then during instruction, some policies may be brought up, but we don't have a class on the Jefferson Parish Sheriff's Office policies where you take a written test when you are done? A. Correct.); R. Doc. 142-3 - Pitfield Dep., 89:12-19; Ex. 4 - Vaught Dep., 72:6-19; Ex. 5 - Mehrtens Dep., 29:1 – 30:6; R. Doc. 105-9 - Vega Dep., 59:14-25.

129.    Ranking JPSO officials are aware that the IACP recommends that Internal Affairs investigate all critical incidents or deaths to determine whether the actions of the officers conformed to the agencies policies, procedures and training, but JPSO has chosen not to do so.

130.    JPSO does not perform investigations of anonymous complaints.

131.    JPSO also does not perform investigations of complaints by family members of people JPSO has killed.

132.    For example, JPSO refused to accept an internal affairs complaint on the shooting of Daniel Vallee even though one was submitted through a signed complaint of Mr. Vallee's daughter.

133.    JPSO does not perform IA investigations of matters involving officer involved shootings that were investigated by the criminal divisions.

134.    JPSO keeps IA investigative files for only 3 years regardless of outcome and then destroys them.

135.    JPSO does not keep records of destruction of evidence when destroying records.

136.    As one Court has held, "JPSO should have known to preserve the disciplinary and training records of the officers involved in the interaction that resulted in the death of Plaintiffs' son" but "fail[ed] to properly implement a litigation hold to cease its routine 3-year document retention policy for IA files."[23]

137.    JPSO does not even implement a litigation hold when civil suits are filed.

138.    JPSO does not utilize separate Use of Force reports to document use of force applications of deputies on a separate form.

139.    Instead, JPSO deputies are supposed to note any application of force in an incident report.

---

23 *Lou v. Lopinto*, R. Doc. 119 at 14.

140.    Thus, Internal Affairs does not review or evaluate all deputies' applications of force – even lethal uses of force – only any use of force that results in a complaint.

141.    JPSO does not have a written policy pertaining to early warning system.

142.    Nor does JPSO follow any criteria or protocols to determine whether early intervention is necessary when there is a pattern of deputy uses of force.

143.    JPSO would not be able to implement an early warning system even if it wanted to, because JPSO has a policy of destroying "all disciplinary records" after three years.[24]

144.    That policy violates Louisiana state law.[25]

145.    JPSO also keeps no records of document destruction, even though such records of document destruction is explicitly required by state law.[26]

146.    As a result, if JPSO wanted to look at patterns of complaints about officers, it would be unable to do so, because it has destroyed the records and failed to keep evidence of the destruction.

147.    Sheriff Lopinto personally declines to exert even the barest form of supervision.

148.    He has admitted that he does not even consistently *read the report* when someone dies in JPSO custody.[27]

149.    When officers fail to follow their use of force training, they are not investigated or disciplined.

150.    For example, JPSO says it trains its deputies to use the T.A.R.P. and the "SWARM" technique to restrain "extremely violent" prisoners in a safe way and to avoid the risks of positional asphyxia.

---

24 *Lou v. Lopinto*, R. Doc. 105-4 - JPSO SOP 22 – Internal Affairs, at 9
25 *See Lou v. Lopinto*, R. Doc. 105 at 5-7, detailing Louisiana's Law of Public Record Preservation
26 La. Admin. Code tit. 4, § XVII-913 ("Agencies shall document the destruction of their records by maintaining a certificate of destruction . . .").
27 *Lou v. Lopinto*, R. Doc. 150-5 (Lopinto Dep.) at 5:24-6:9

151.   JPSO said that the decedent in *Lou v. Lopinto* was "extremely violent."

152.   But none of the seven deputies who interacted with that decedent used the T.A.R.P or "SWARM" technique.

153.   Not one of the seven deputies were investigated by IA, sanctioned, counseled or even re-trained.

154.   JPSO also fails to investigate complaints in the form of civil lawsuits and fails to use facts elicited by civil suits as the basis for investigations, policy changes, training, or supervision.

155.   JPSO has a custom, practice, and policy of hiring officers who have been terminated from or disciplined by other departments for excessive force.

156.   Upon information and belief, JPSO does not discipline officers, such as the Shooter Defendants, who fail to deescalate situations where persons, like Decedent, sit in an automobile while unarmed.

157.   In light of the fact that the Fourth Amendment to the United States Constitution states that "no Warrants shall issue, but upon probable cause," Plaintiff notes that JPSO has no policy on how its deputies are to obtain search warrants.

158.   JPSO deputies, however, have repeatedly sought and obtained warrants without probable cause, and did so here, when they invaded Plaintiff's home, searched her residence, and took – but never returned – her property, a properly licensed handgun.

159.   The aforementioned search was without probable cause that Plaintiff had committed a crime.

160.   The JSPO does conducts warrantless searches without probable cause routinely.

161.   Deputies are not trained that this activity is illegal or improper.

162.     The need for said training and discipline, as aforesaid, is so obvious that the failure of Defendants to conduct said training and discipline establishes Defendants' objective deliberate indifference to the constitutional rights of Plaintiff and Decedent and all who live in the City of Metairie, Louisiana.

163.     As a consequence of Defendant Lopinto's acts or failures to act and/or written and/or unwritten policies or customs and failure to train and discipline as aforesaid, Decedent suffered a violation of his right to be free from excessive force under the Fourth Amendment and was shot to death, and Plaintiff was damaged as detailed in the Damages section of this Complaint.

### Ratification by Final Policymaker

164.     A *Monell* claim can be established "if the policymaker approves a subordinate's decision and the basis for it, as this 'ratification' renders the subordinate's decision a final decision by the policymaker."[28]

165.     Here, Sheriff Lopinto watched the body camera footage of the shooting.

166.     After watching the body camera footage, Lopinto said that the shooting officer(s) "utilized the proper force."

167.     After watching the body camera footage of Decedent's killing, Lopinto approved of the arresting and shooting deputies' decisions and the basis for those decisions.

### FOURTH CLAIM FOR RELIEF
### Assault and Battery and Negligence
### (La. R.S. § 14:36,  La. R.S. § 14:33)

168.     All preceding paragraphs are incorporated as if fully re-written herein.

---

28 *Allen v. Hays,* 21-20337 (5th Cir., March 21, 2023) at *15.

**Assault**

169.    In Louisiana, "[a]ssault is an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery." La. R.S. § 14:36.

170.    "The elements of assault are: (1) the intent-to-scare mental element (general intent); (2) conduct by the defendant of the sort to arouse a reasonable apprehension of bodily harm; and (3) the resulting apprehension on the part of the victim." *Terrell v. Richardson*, No. CV 20-999, 2023 WL 6465130, at *18 (W.D. La. Sept. 29, 2023)(citing, *State in Int. of Tatom*, No. 84-CA-477 (La. App. 5 Cir. 1/14/85), 463 So. 2d 35, 37.

171.    At all times relevant to this Complaint, the Arresting Defendants and/or John Doe Defendants threatened to scare and/or use force and/or inflict imminent bodily injury upon Decedent by and through their use and intentional display of firearms at Decedent.

172.    The Arresting Defendants' and/or John Doe Defendants' display and use of firearms caused Decedent to have a reasonable apprehension that harmful and offensive contact with his person was imminent.

173.    As a consequence of the Arresting Defendants' and/or John Doe Defendants' display of firearms, as aforesaid, Decedent in fact apprehended a harmful and offensive contact, i.e., his painful death from being struck by bullets.

**Battery**

174.    "Battery is the intentional use of force or violence upon the person of another . . . ." La. R.S. § 14:33.

175.    The Louisiana Supreme Court has held that the "use of force ... contemplates the minimum force or violence upon the person necessary to commit the crime of battery and distinguishes the crime from an accidental or incidental touching. Moreover, the force constitutes

the criminal act itself, rather than the means of overcoming the victim's will." *Terrell v. Richardson*, No. CV 20-999, 2023 WL 6465130, at *18 (W.D. La. Sept. 29, 2023)(citations omitted).

176.  "Excessive force transforms ordinarily protected use of force into an actionable battery, rendering the defendant officer and his employer liable for damages." *Id.* (citations omitted).

177.  The Arresting Defendants and/or John Doe Defendants intentionally fired his/her/their firearm(s) multiple times at Decedent, striking his person.

178.  The Arresting Defendants' and/or John Doe Defendants' intentional actions, as aforesaid, were done without the consent of Decedent and without lawful justification or excuse.

179.  The Arresting Defendants and/or John Doe Defendants battered Decedent, thereby killing him.

180.  The actions of the Arresting Defendants and/or the John Doe Defendants, as alleged herein, were committed within the course and scope of their employment with the JPSO.

181.  The actions of the Arresting Defendants and/or the John Doe Defendants, as alleged herein, were intentional, malicious, willful, wanton, negligent, and/or in reckless disregard of the rights of Decedent.

### Negligence

182.  "The duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability under" Article 2315. *Lemann v. Essen Lane Daiquiris, Inc*., 2005-1095 (La. 3/10/06); 923 So.2d 627, 632-33 (*citing Mathieu v. Imperial Toy Corp*., 94-0952 (La. 11/30/94); 646 So. 2d. 318, 321).

183.  Furthermore, municipal employers have a duty to exercise reasonable care in the hiring, training, and supervision of its employees. Failure to do so is a cognizable tort under Louisiana Civil Code art. 2315.

184.    Here, Defendants failed to meet the aforementioned duty of care with regard to training, hiring, and/or supervising the deputies/officers who used, refused to intervene, or otherwise endorsed or ratified the use of excessive against and use of warrantless searches without probable cause regarding Plaintiff and/or Decedent.

185.    Sheriff Lopinto in his official capacity is liable for the state law violations of his deputies under the doctrine of *respondeat superior*.

186.    As a result of the Arresting Defendants' and/or the John Doe Defendants' actions as described above, including the aforesaid assault and battery of Decedent, Decedent and/or Plaintiff, as Administratrix of the Estate of Calvin Cains, III has been damaged as stated in the Damages section of this Complaint.

### FIFTH CLAIM FOR RELIEF
**Survival and Wrongful Death Under 42 U.S.C. § 1983**
**(La. Civ. Code Ann. art. 2315.1 and 2315.2)**

187.    All preceding paragraphs are incorporated as if fully re-written herein.

188.    In the Fifth Circuit, a plaintiff seeking to recover on a wrongful death claim under § 1983 must prove both the alleged constitutional deprivation required by § 1983 and the causal link between the defendant's unconstitutional acts or omissions and the death of the victim, as required by the state's wrongful death statute. *Phillips ex rel. Phillips v. Monroe Cnty., Miss.*, 311 F.3d 369, 374 (5th Cir. 2002).

189.    The Louisiana Supreme Court has clarified that a wrongful death action "compensates the beneficiaries for their own injuries which they suffer from the moment of the victim's death and thereafter." *Cooper-McClintok v. U.S.,* No. CIV.A. 11-1934, 2014 WL 4925113, at *1 (W.D. La. Sept. 30, 2014).

190.    Plaintiff is entitled to recover compensatory damages for the wrongful death of Decedent as alleged herein.

191.    At the time of his death, Decedent was survived by Plaintiff, his mother, who is the sole beneficiary of his estate.

192.    At the time of his death, Decedent, was eighteen (18) years old and reasonably expected to live a full, fruitful, and meaningful life, and to have provided substantial services, protection, and care to the beneficiary of his Estate, as well as security, companionship, guidance, advice, income, and support.

193.    As a result of Decedent's death, Plaintiff, the beneficiary of his estate, has been deprived of his income, services, protection, care, and assistance, together with his society, companionship, comfort, guidance, and advice.

194.    As stated above, the Arresting Defendants and/or the John Doe Defendants and/or Defendant Lopinto used and/or failed to intervene to stop excessive force during Decedent's arrest and/or permitted and/or perpetuated and ratified the use of excessive force and promulgated a culture of excessive force which caused Decedent to suffer the deprivation of his rights under the Fourth Amendment to the United States Constitution and be shot and killed.

195.    Accordingly, Plaintiff, as the Administratrix of the Estate of Calvin Cains III, is entitled to recover the following damages for Decedent's wrongful death, including but not limited to: expenses for the care, treatment, EMS transportation, and hospitalization incident to the injury resulting in death; compensation for the pain and suffering of Decedent; the funeral and burial expenses of Decedent; the present monetary value of Decedent's reasonably expected net income, the services protection, care and assistance of Decedent, whether voluntary or obligatory; and the society, companionship, comfort, guidance, and advice of Decedent.

196.    Sheriff Lopinto in his official capacity is liable for the state law violations of his deputies under the doctrine of *respondeat superior*.

197.    As a result of the wrongful death of Decedent which was directly and proximately caused by Defendants' actions as described above, Plaintiff, as Administratrix of the Estate of Calvin Cains, III has been damaged as stated in the Damages section of this Complaint.

## DAMAGES

198.    All preceding paragraphs are incorporated as if fully re-written herein.

199.    As a direct and proximate result of Defendants' actions, as set forth above, Plaintiff and Decedent have been damaged, including but not limited to: Decedent was shot and killed, and endured pain, anguish, and fear before his death, Plaintiff's family was destroyed, and Plaintiff has endured pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to self-esteem, emotional distress, fear, anxiety, loss of sense of personal safety, dignity, and legal fees and costs.

200.    In addition, Plaintiff avers that she is entitled to wrongful death damages, based upon the loss of consortium and economic loss including, but not limited to, loss of love and affection, guidance, past and future and parental support.

## PRAYER FOR RELIEF

201.    WHEREFORE, Plaintiff prays for judgment against all Defendants, jointly and severally, for not less than $5,000,000.00 including but not limited to:

A.    Compensatory and consequential damages in an amount to be determined by the Court in excess of the Court's jurisdictional amount;

B.    Punitive damages in an amount to be determined at trial, for the willful, reckless, and malicious conduct of Defendants;

C.    Equitable relief, including, without limitation, that Defendants be made to adopt an

appropriate policy to prevent future instances of the type of misconduct described herein;

      D.      Attorneys' fees and the costs of this action and other costs that may be associated with this action; and

      E.      Any and all other relief that this Court deems equitable, just and proper.

## **JURY DEMAND**

      Plaintiff respectfully demands a jury trial on all issues of fact that may arise from the pleadings.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td></td><td></td></tr>
<tr><td>/s/ William Most.</td><td>/s/ Robert F. DiCello</td></tr>
<tr><td>William Most, La. Bar No. 36914</td><td>Robert F. DiCello*</td></tr>
<tr><td>Dave Lanser, La. Bar No. 37764</td><td>Kenneth P. Abbarno*</td></tr>
<tr><td>MOST & ASSOCIATES</td><td>Jordyn A. Parks*</td></tr>
<tr><td>201 St. Charles Ave., Ste. 2500, #9685</td><td>Joe F. Fouche III*</td></tr>
<tr><td>New Orleans, LA 70170</td><td>DICELLO LEVITT LLP</td></tr>
<tr><td>(504) 509-5023</td><td>8160 Norton Parkway, Third Floor</td></tr>
<tr><td>williammost@gmail.com</td><td>Mentor, Ohio 44060</td></tr>
<tr><td></td><td>Tel.:  440-953-8888</td></tr>
<tr><td>*Counsel for Plaintiff*</td><td>Fax:  440-953-9138</td></tr>
<tr><td></td><td>Email: rfdicello@dicellolevitt.com</td></tr>
<tr><td></td><td>      kabbarno@dicellolevitt.com</td></tr>
<tr><td></td><td>      jparks@dicellolevitt.com</td></tr>
<tr><td></td><td>      jfouche@dicellolevitt.com</td></tr>
<tr><td></td><td></td></tr>
<tr><td></td><td>*Counsel for Plaintiff*</td></tr>
<tr><td></td><td></td></tr>
<tr><td></td><td>*\*Pro Hac Vice admission forthcoming*</td></tr>
</table>